**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 0 4 2021

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

SUSAN DAVENPORT,
CHRIS DAVENPORT,
LLOYD ST. CLAIR, and
FLOYD ST. CLAIR,

    Plaintiffs,

    v.

CITY OF LITTLE ROCK, a municipality,
KENTON BUCKNER, individually and
in his official capacity as police chief,
AMBER KALMER, individually
RUSS LITTLETON, individually,
JASON FOLLETT, individually,
TIMOTHY CALHOUN, individually,
MATTHEW THOMAS, individually,
VICKY KEATHLEY, individually, and
KENNETH TEMPLE, individually,

    Defendants.

Case No. 4:21-cv-879-JM

***JURY TRIAL DEMANDED***

This case assigned to District Judge _Moody_
and to Magistrate Judge _Ervin_

**COMPLAINT AT LAW**

    NOW COME, Plaintiffs, SUSAN DAVENPORT, CHRIS DAVENPORT, LLOYD ST.

CLAIR and FLOYD ST. CLAIR (hereafter "PLAINTIFFS"), by and through their attorneys,

LAUX LAW GROUP and BEN CRUMP, PLLC, and for their cause of action, states as follows:

INTRODUCTION

    The Fourth Amendment to the United States Constitution reads:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871, 42 U.S.C. § 1983 and Arkansas state law.  This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367.  Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which PLAINTIFFS complain arose in this District.

2.     This civil action is re-filed, with the current pleading, pursuant to the Arkansas "savings statute," A.C.A. § 16-56-126.  The action was previously filed in federal court in the Eastern District of Arkansas, as *Davenport, et al. v. City of Little Rock, et al.*, Case No. 4:19-CV-00552-JM.  PLAINTIFFS' case was dismissed without prejudice by the Honorable James M. Moody, Jr. on October 6, 2020.  *See October 6, 2020 Voluntary Dismissal Order, attached as Exhibit A.*  The Eighth Circuit applies A.C.A. § 16-56-126 to § 1983 claims, and PLAINTIFFS, in bringing the current cause, invoke said Arkansas statute.  *Whittle v. Wiseman*, 683 F.2d 1128, 1129 (8th Cir. 1982).

## PARTIES

3.     At all relevant times, PLAINTIFFS, and each of them, were citizens of the United States of America and were, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.  At all relevant times, PLAINTIFFS, and each of them, resided in Pulaski County, Arkansas.  At all relevant times, including September 1, 2016, SUSAN DAVENPORT ("SUSAN") and CHRIS DAVENPORT ("CHRIS") were wife and husband and lived at 3220 King Road.  At all relevant times, including September 1, 2016, LLOYD ST. CLAIR ("LLOYD") and FLOYD ST. CLAIR ("FLOYD") were brothers and lived at 3114 King Road.

4.      At all relevant times, the CITY OF LITTLE ROCK (hereafter "CITY") was a municipality organized and existing under the laws of the State of Arkansas.  At all relevant times, the CITY was located in the County of Pulaski, State of Arkansas, and was the employer of the individually named defendants.  At all relevant times, the CITY is and was empowered, funded and directed to pay any § 1983 civil rights or intentional tort judgment for compensatory damages, actual damages and attorney fees, if applicable, for which any CITY employee acting within the scope of his or her employment is found liable.

5.      Accordingly, the CITY is an indemnification party regarding the acts and/or omissions of which PLAINTIFFS complain.  As reflected in the matter of *Ellison v. Lesher, et al.*, 4:11-CV-752 BSM, the CITY has the authority to provide for the indemnification of CITY police officers accused of civil rights violations and intentional torts committed within the scope of their employment, and its common practice was to authorize indemnification for such officers.

6.      At all relevant times, the CITY participated in the Municipal Legal Defense Program which is offered by the Arkansas Municipal League to Arkansas towns and cities.  The acts and omissions of which PLAINTIFFS complain constitute a civil rights lawsuit against the CITY and the individually-named defendants.  The Arkansas Municipal Legal is a primary or secondary indemnification party regarding the acts and omissions of CITY and the individually-named defendants of which PLAINTIFFS herein complain.

7.      At all relevant times, the CITY delegates its policy-making authority to its chiefs of police, including Defendant, KENTON BUCKNER (hereafter "DEFENDANT BUCKNER"), and his predecessors, including Stuart Thomas.

8.      At all relevant times, DEFENDANT BUCKNER, was employed by the CITY, and acted under the color of state law, within the scope of his employment.  At all relevant times,

DEFENDANT BUCKNER had the ultimate responsibility within the Little Rock Police Department (LRPD) for the protection of life, the upholding of the United States Constitution, the preservation of law and order, the investigation of all crimes and the enforcement of the laws of the State of Arkansas.

9.     At all relevant times, the CITY delegated to DEFENDANT BUCKNER final policy-making authority to create, adopt and implement police policies within the LRPD whether formal or informal.  At all relevant times, DEFENDANT BUCKNER was responsible for assuring the enforcement of LRPD General Orders, Rules & Regulations and Divisional Operational Procedures (collectively "policy" or "policies") among LRPD officers.  As Chief of Police of LRPD, and pursuant to the authority vested in him, DEFENDANT BUCKNER was empowered to initiate procedural changes to address or remedy any unconstitutional trend or pattern that he identified during his tenure as chief.

10.     At all relevant times, DEFENDANT BUCKNER had the final authority in terms of promulgating policies for enactment at the LRPD–whether those policies were formal or informal– via memoranda to his LRPD subordinates, down the chain of command.

11.     At all relevant times, Defendants, AMBER KALMER and RUSS LITTLETON (collectively "NARCOTICS DEFENDANTS"), and each of them, were employed by the CITY as LRPD police officers, working in the LRPD Narcotics Unit and acting under the color of state law, within the scope of their employment.

12.     At all relevant times, Defendants, JASON FOLLETT, TIMOTHY CALHOUN and MATTHEW THOMAS (collectively "SWAT DEFENDANTS"), and each of them, were employed by the CITY as LRPD police officers and, specifically, were members of the LRPD

4

Special Weapons and Tactics (SWAT) Unit, acting under the color of state law and within the scope of their employment.

13.     DEFENDANT FOLLETT and DEFENDANT CALHOUN, and each of them, were SWAT supervisors responsible for the execution of SWAT Team dynamic entries and raids, as well as assuring that all such SWAT Team dynamic entries and raids were conducted legally and within all applicable constitutional limits.

14.     At all relevant times, Defendants, VICKY KEATHLEY and KENNETH TEMPLE (collectively "INVESTIGATION DEFENDANTS"), and each of them, were employed by the CITY as police officers, acting under the color of state law and within the scope of their employment. In 2016-17, DEFENDANT KEATHLEY was a member of the Internal Affairs Division ("IAD") and charged with investigating police misconduct and policy violations. In June 2017, DEFENDANT TEMPLE was a member of the Deadly Force Review Board ("DFRB") and charged with investigated the quality of IAD investigations.   At all relevant times, both DEFENDANT KEATHLEY and DEFENDANT TEMPLE reported the findings of the respective reviews to DEFENDANT BUCKNER.

15.     NARCOTICS DEFENDANTS, INVESTIGATION DEFENDANTS and SWAT DEFENDANTS are herein collectively referred to as "DEFENDANT OFFICERS."

BACKGROUND FACTS

16.     At all relevant times, the LRPD had a Narcotics Unit which was responsible for the investigation of criminal offenses related to the trafficking of controlled substances. At all relevant times, NARCOTICS DEFENDANTS were members of the Narcotics Unit. The Narcotics Unit is responsible for the investigation of criminal offenses related to the trafficking of controlled substances. According to the CITY, during 2016, the Narcotics Unit arrested 982 individuals and

5

charged them with 1,965 felonies and 1,317 misdemeanor crimes. The Narcotics Unit sometimes enlists the assistance of confidential informants and cooperating individuals ("C.I.s") to provide information on potential drug traffickers and to participate in drug stings in the role of drug purchaser for which the C.I.s are monetarily or otherwise compensated.

17.     The SWAT Unit is staffed by a Lieutenant (Unit Commander), two (2) sergeants (Team Leaders) and twenty-five (25) officers. At all relevant times, the LRPD had a SWAT policy which reflects that the SWAT Unit's "primary mission" is "to provide support to the Department during operations that require special training and equipment to resolve high-risk situations." The LRPD's SWAT policy states that "[e]ach tactical situation is unique and may require different responses." According to the CITY, in 2016, the SWAT Unit responded to seven (7) SWAT call-outs and executed eighty-nine (89) high-risk search warrants.

18.     The SWAT Unit is equipped with an array of weaponry, including a carbine assault rifle, which is comparable to an AR-15. The assault rifle of choice most often at the LRPD is the .223 caliber Bushmaster with EOTech holographic laser scope or Bushmaster M4-Type Carbine. SWAT assault rifles and ammunition are depicted in Photographs 1-3 (below) respectively:



**Photograph 1**



**Photograph 2**



**Photograph 3**

19.     The SWAT Unit team members are outfitted head-to-toe in para-military tactical uniforms, including body armor, assorted weaponry, night vision equipment and other protective gear, as depicted in Photographs 4-5 (below):





**Photograph 4**                          **Photograph 5**

20.    Both the LRPD SWAT Unit and Narcotics Unit are under the direct command of the Special Investigations Division Commander who reports directly to the LRPD chief of police. From June 2014 until late 2018 the chief of police was DEFENDANT BUCKNER.

21.    A "no-knock" warrant is defined as a search warrant that authorizes police officers to enter certain premises without first knocking and announcing their presence or purpose prior to entering the premises.  In order to obtain a "no-knock" warrant, a police officer must submit an affidavit to a judge or magistrate whom, upon receiving and reviewing said affidavit, will decide whether to authorize an exception to the "knock and announce" rule based on the facts presented in the affidavit.

22.    At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, were trained in the Fourth Amendment and proper search and seizure law, and were further that aware that affidavits submitted to judges or magistrates by officers seeking to obtain "no-knock" warrants must be premised on a good faith determination that probable cause exists.

23.    At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew that the Fourth Amendment's requirement that a specific place be described when applied to dwellings refers to a single-family unit (the residence of one person or family).  At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew that a warrant which describes an entire building when cause is shown for searching only one apartment unit is void.

24.    At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew that an issued warrant which allows a police officer to enter

8

a dwelling located at one address does not permit the police officer to enter another dwelling situated at another address on the basis of the warrant for the initial dwelling.

25.    At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew that "no-knock" warrants were reserved for "high-risk situations," and that it is unconstitutional and unlawful to knowingly submit affidavits which contain material misrepresentations of fact or are otherwise untruthful to judges or magistrates. At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, were aware of the inherently dangerous nature of SWAT entries.

26.    Prior to April 2014, the CITY and DEFENDANT BUCKNER knew that the NARCOTICS DEFENDANTS and other CITY employees made material misrepresentations and omissions to judges in order to gain "no-knock" entry into homes despite the fact that the owners and residents of those homes did not meet the required criteria and did not constitute a "high risk situations."

27.    Moreover, the CITY and DEFENDANT BUCKNER knew that the NARCOTICS DEFENDANTS and other CITY employees often presented affidavits for "no-knock" warrants to judges in which material misrepresentations and untruths were contained.

28.    Furthermore, at all relevant times, the CITY and DEFENDANT BUCKNER knew that the NARCOTICS DEFENDANTS, and each of them, had a practice of utilizing C.I.s that were known to be unreliable, to provide false information and to have prior convictions for crimes involving false statements and deception. They knew that the NARCOTICS DEFENDANTS' failure to adhere to constitutional requirements of the Fourth Amendment would result in C.I.s becoming motivated to lie for monetary reasons or otherwise exploit the system for personal benefit.

29.     Despite this knowledge, in or around April 2014, and for many years prior thereto, there existed an unconstitutional official policy at the LRPD (hereafter "mandatory SWAT policy") whereby SWAT Unit involvement was required for every search warrant executed by the LRPD, regardless of the fact that the constitutional threshold for this type of entry was often not satisfied in the circumstances presented to the NARCOTICS DEFENDANTS.

30.     An excerpt from an April 7, 2014 LRPD Memorandum from an LRPD sergeant reads as follows:

> The reason SWAT was used is because many times guns and violence are associated with narcotics. *It is a mandate from the Office of the Chief of Police that the SWAT team execute all search warrants.* See LRPD Memorandum attached hereto as Exhibit 1 (emphasis added).

31.     A "policy," as defined by the Eighth Circuit Court of Appeals in *Mettler v. Whitledge*, 165 F.3d 1197 (1999), is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."

32.     A *Monell* "custom" is defined as a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law.

33.     Pleading alternately, at all relevant times, including prior to April 2014, there existed an unconstitutional *Monell* municipal "custom" at the LRPD whereby LRPD chiefs of police, including DEFENDANT BUCKNER, knowingly authorized the use of the SWAT Unit for every search warrant executed by the LRPD or in situations not reasonably characterized as "high risk" despite the fact that such a custom constitutes a continuing violation the Fourth Amendment.

34.     At all relevant times, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew or should have known that the mandatory SWAT policy did

not comport with the liberty protections established and enshrined in the United States Constitution, particularly, the Fourth and Fourteenth Amendments.

35.    At all relevant times, including during various IAD investigations resulting from the "no-knock" narcotics raids, DEFENDANT BUCKNER and the DEFENDANT OFFICERS, and each of them, knew that the "no-knock" narcotics raids executed by the NARCOTICS DEFENDANTS and SWAT DEFENDANTS were in violation of LRPD policy and the United States Constitution.

36.    Despite this knowledge and despite the inherently dangerous nature of the "no-knock" narcotics raids conducted by the NARCOTICS DEFENDANTS and SWAT DEFENDANTS, DEFENDANT BUCKNER continued to promulgate an unconstitutional official policy and/or authorize, support and maintain a *Monell* "custom" which was unconstitutional and posed an unreasonable threat of harm to the persons and property of Little Rock citizens.

### THE UNCONSTITUTIONAL AND ILLEGAL SEPTEMBER 1, 2016 "NO-KNOCK" RAIDS OF PLAINTIFFS' SEPARATE HOMES EXECUTED BY NARCOTICS DEFENDANTS AND SWAT DEFENDANTS

37.    At all relevant times, including September 1, 2016, SUSAN and her husband, CHRIS, resided at 3220 King Road, Little Rock, Arkansas.

38.    At all relevant times, including September 1, 2016, LLOYD and his brother, FLOYD, resided at 3114 King Road, Little Rock, Arkansas.

39.    3114 King Road and 3220 King Road are depicted in Photograph 6 (below):



**Photograph 6**

40.    3114 King Road and 3220 King Road are separate, distinct addresses. The dwelling located at 3114 King Road is over two hundred (200) feet away from the dwelling located at 3220 King Road.

41.    At all relevant times, including September 1, 2016 and several years prior thereto, LLOYD received his mail at his home, located at 3114 King Road, as reflected in Photograph 7 (below).



**Photograph 7**

12

42.    On August 31, 2016, DEFENDANT KALMER submitted an affidavit to Judge Alice F. Lightle wherein she requested Judge Lightle authorize the execution of a "no-knock" search warrant on a "shop located at 3220 King Road." In her affidavit, DEFENDANT KALMER described the premises she wished to enter as "a dwelling 'shop' on the west side of the residence." In her affidavit, DEFENDANT KALMER stated that there were "no numbers" on the "shop," which she described as "being yellow in color, doors facing east…"

43.    In her affidavit, DEFENDANT KALMER stated that on August 29, 2016 she was contacted by a reliable C.I. who stated that SUSAN "was distributing of Methamphetamine from the shop at 3320 [sic] King Road…" DEFENDANT KALMER stated in her affidavit that the C.I. told her SUSAN lived in the "shop" and sold her narcotics from there.

44.    DEFENDANT KALMER attested that the "shop" she wanted to search was located at 3220 King Road.

45.    The "shop" DEFENDANT KALMER described in her affidavit is actually LLOYD and FLOYD's residence, which is located at 3114 King Road.

46.    DEFENDANT KALMER never advised Judge Lightle in her affidavit that there were two (2) separate dwellings at which the NARCOTICS DEFENDANTS and SWAT DEFENDANTS intended to conduct two (2) separate "no-knock" raids. She never advised Judge Lightle in her affidavit that the NARCOTICS DEFENDANTS and SWAT DEFENDANTS intended to conduct two (2) separate "no-knock" raids upon distinct, separate dwellings located at 3114 King Road and 3220 King Road based on Judge Lightle's forthcoming warrant.

47.    DEFENDANT KALMER's affidavit contains misrepresentations of fact and material omissions.

13

48.    DEFENDANT KALMER never requested a warrant to enter the "non-shop" dwelling located at 3220 King Road, which is east of 3114 King Road.

49.    DEFENDANT KALMER's never sought nor received court authorization for executing a "no-knock" warrant at 3114 King Road.

50.    Neither DEFENDANT KALMER nor DEFENDANT LITTLETON video or audio recorded any aspect of their purported dealings with the C.I. mentioned in DEFENDANT KALMER's affidavit.

51.    On August 31, 2016, Judge Lightle issued the warrant based on DEFENDANT KALMER's affidavit and permitted NARCOTICS DEFENDANTS and SWAT DEFENDANTS to enter the premises of 3220 King Road without knocking and announcing. Judge Lightle did not authorize any search of 3114 King Road prior to September 1, 2016.

52.    Even though the warrant issued by Judge Lightle only authorized a "no-knock" warrant execution on one dwelling, SWAT DEFENDANTS simultaneously conducted "no-knock" warrant executions on two (2) separate dwellings–3114 King Road and 3220 King Road. NARCOTICS DEFENDANTS also entered the premises of 3114 King Road and 3220 King Road, despite obtaining a warrant that only allowed entry into one dwelling.

53.    Prior to September 1, 2016, NARCOTICS DEFENDANTS and SWAT DEFENDANTS met and discussed preparation for the simultaneous "no-knock" warrant executions they intended to conduct on the dwellings located at 3114 King Road and 3220 King Road.

54.    On or about September 1, 2016, official SWAT forms were filled out which reflect that there was a briefing in regard to the planned "no-knock" warrant execution on 3220 King Road and that the briefing was approximately one (1) minute in length.

14

55.     Regarding the inhabitant(s) of 3220 King Road or "suspect," the official SWAT forms reflect that on September 1, 2016 the NARCOTICS DEFENDANTS and SWAT DEFENDANTS did not know if the suspect had a known violent history.  On September 1, 2016, they did not know if the suspect is on parole or mentally unstable.

56.     On September 1, 2016, the NARCOTICS DEFENDANTS and SWAT DEFENDANTS did not know if the suspect was known or believed to be known to possess a weapon.  On September 1, 2016, the NARCOTICS DEFENDANTS and SWAT DEFENDANTS did not know if there were any children, elderly persons or handicapped persons present at the site.

### The September 1, 2016 "No-Knock" Raid on 3114 King Road

57.     On September 1, 2016, at approximately 6:30 a.m., NARCOTICS DEFENDANTS and SWAT DEFENDANTS initiated a "no-knock" raid on LLOYD and FLOYD's home, the dwelling located at 3114 King Road.

58.     The SWAT DEFENDANTS who entered 3114 King Road lined up for an aggressive entry.  Using a battering ram, these SWAT DEFENDANTS smashed through LLOYD and FLOYD's front door and threw a flash bang grenade into their home.   These SWAT DEFENDANTS rapidly entered the home with their assault rifles drawn and quickly branched into different rooms.

59.     DEFENDANT THOMAS was one of the SWAT DEFENDANTS who conducted the execution of the "no-knock" warrant on 3114 King Road.  DEFENDANT THOMAS was assigned to the point position.

60.     At the time of the execution of the "no-knock" warrant on 3114 King Road, LLOYD was asleep in his bedroom.

15

61.     DEFENDANT THOMAS came upon LLOYD who, terrified by the grenade, was in the process of getting out of bed.  When DEFENDANT THOMAS saw LLOYD he backed away from LLOYD's bedroom and opened fire on LLOYD with his Bushmaster M4-Type carbine assault rifle, shooting over ten (10) times through a wall into LLOYD's bedroom, hitting him in his back and abdomen while he was in his bedroom trying to protect himself.

62.     LLOYD, who had picked up his trusty old rifle for self-defense after hearing the grenade explode, did not have the rifle raised at the time he was shot multiple times by DEFENDANT THOMAS from behind a wall outside LLOYD's bedroom.

63.     DEFENDANT THOMAS did not give LLOYD any warning that he was going to use deadly force prior to shooting LLOYD through his bedroom wall with his assault rifle.

64.     FLOYD was subdued in another part of 3114 King Road at gunpoint and the NARCOTICS DEFENDANTS and SWAT DEFENDANTS searched the entire home.

The Simultaneous September 1, 2016 "No-Knock" Raid on 3220 King Road

65.     On September 1, 2016, at approximately 6:30 a.m., the very moment their fellow officers entered the dwelling located at 3114 King Road, NARCOTICS DEFENDANTS and SWAT DEFENDANTS initiated a simultaneous "no-knock" raid on SUSAN and CHRIS' home, the dwelling located at 3220 King Road.

66.     The SWAT DEFENDANTS who entered 3220 King Road lined up for an aggressive entry.  Using a battering ram, these SWAT DEFENDANTS smashed through CHRIS and SUSAN's front door and threw a flash bang grenade into their home.  These SWAT DEFENDANTS rapidly entered the home with their assault rifles drawn and quickly branched into different rooms.

67.     At the time of the execution of the "no-knock" warrant on 3220 King Road, CHRIS and SUSAN were asleep in their bedroom.

68.     SUSAN heard the bang of the flash grenade, mistaking it for a gunshot. She then heard people running through her house.

69.     Fearing for SUSAN's life, CHRIS pushed her out of the bed and on to the floor as SWAT DEFENDANTS burst through the bedroom door, yelling at CHRIS and SUSAN and pointing assault rifles at them. The SWAT DEFENDANTS screamed at SUSAN and CHRIS: "where are the drugs!!!" and "you are all going to jail!!!" The NARCOTICS DEFENDANTS and SWAT DEFENDANTS handcuffed SUSAN and CHRIS and searched the entire home.

70.     Acknowledging that the "no-knock" raid of 3220 King Road was a failure in terms of Methamphetamine indicated, DEFENDANT LITTLETON told CHRIS and SUSAN that he was going to have to arrest CHRIS for something or else it would not look good to his superiors and the media.

71.     CHRIS, SUSAN, LLOYD and FLOYD were all arrested. LLOYD was taken to UAMS where he was treated for life-threatening injuries, handcuffed to his hospital bed and placed under the 24-hour custody of the LRPD. LLOYD underwent several surgeries as a result of his gunshot wounds.

72.     Though DEFENDANT KALMER attested to Judge Lightle that SUSAN possessed massive quantities of Methamphetamine for distribution, no massive quantities of the drug were found in 3220 King Road or 3114 King Road.

73.     On September 1, 2016, in Incident No. 2016-107426, LLOYD was charged with multiple crimes, including aggravated assault upon DEFENDANT THOMAS. The September 1,

2016 report in Incident No. 2016-107426 reflects that LLOYD's address on that date was 3114

King Road, Little Rock, Arkansas 72206, as reflected in Photograph 8 (below):



**Photograph 8**

74.     At least as early as September 1, 2016, the CITY knew that LLOYD's address was

3114 King Road, AR 72206.

75.     At least as early as September 1, 2016, the CITY knew that the "shop" where

LLOYD was shot by DEFENDANT THOMAS was located at 3114 King Road, Little Rock.

76.     The report in LRPD Incident No. 2016-107426, which reflects LLOYD's address

as 3114 King Road is a part of the official IAD file in LRPD IAD Case No. II2016-00018.

<u>LRPD INTERNAL AFFAIRS DIVISION INVESTIGATION</u>

77.     On September 1, 2016, the LRPD began its IAD investigation of LLOYD's

shooting by DEFENDANT THOMAS.  DEFENDANT KEATHLEY was the sergeant in charge

of the IAD investigation.  As IAD investigator, DEFENDANT KEATHLEY was responsible for

determining if any LRPD policies were violated during the shooting.  Moreover, DEFENDANT

18

KEATHLEY was responsible for noting and addressing any and all policy violations of which she became aware during her investigation.

78.     During the investigation of the shooting, the LRPD Crime Scene Search Unit (CSSU) took over four hundred (400) photographs of the interiors and exteriors of 3114 King Road and 3220 King Road, including surrounding areas and nearby vehicles and equipment.

79.     There is a mailbox in front of the residence at 3220 King Road and it is depicted in Photographs 9-10 (below) which were taken by the CSSU on September 1, 2016 during the LRPD investigation of LLOYD's shooting and put in the official LRPD file:



**Photograph 9**                                     **Photograph 10**

80.    3114 King Road and 3220 King Road are distinct addresses.  The dwelling located at 3114 King Road is over two hundred (200) feet from the dwelling located at 3220 King Road as reflected in Photograph 11 (below) which was taken by CSSU during the investigation and put in the official LRPD file[1]:



Photograph 11

81.    There is a mailbox in front of the residence at 3114 King Road and that mailbox is depicted in Photograph 12 (below) which was taken by SUSAN:



Photograph 12

---

[1] All marks on CSSU photographs in PLAINTIFFS' complaint were made by PLAINTIFFS.

82. The LRPD did not take any close-up photographs of the mailbox at 3114 King Road as it did for the mailbox at 3220 King Road.

83. The only photographs taken by LRPD which feature the mailbox at 3114 King Road are incidental images taken from a considerable distance so that the number on the mailbox cannot be seen and the mailbox itself is barely identifiable, as reflected in Photographs 13-14 (below):

 

**Photograph 13**                    **Photograph 14**

84. On November 9, 2016, DEFENDANT THOMAS was questioned about the shooting by DEFENDANT KEATHLEY. During DEFENDANT THOMAS' questioning, he admitted that he gave no warning to LLOYD before shooting him.

85. Throughout the IAD investigation and as late as June 7, 2017, DEFENDANT OFFICERS intentionally misrepresent facts in the official LRPD file by stating that the "shop"-- which is actually LLOYD's home, where he was shot by DEFENDANT THOMAS–is located at 3220 King Road.

86. The INVESTIGATING OFFICERS continued to misrepresent the location of LLOYD's shooting as 3220 King Road even though they knew the address was 3114 King Road.

21

87.    On November 4, 2016, DEFENDANT KEATHLEY wrote a letter to LLOYD, requesting information related to his September 1, 2016 shooting by DEFENDANT THOMAS, as depicted in Photograph 15 (below):



**Photograph 15**

88.    DEFENDANT KEATHLEY's November 4, 2016 letter to LLOYD was sent to his address: 3114 King Road, Little Rock, AR 72206.

89.    At least as early as November 4, 2016, DEFENDANT KEATHLEY knew that LLOYD's address was 3114 King Road, AR 72206.

90.    DEFENDANT KEATHLEY's November 4, 2016 letter to LLOYD is a part of the official investigation file for IAD Case No. II2016-00018.

91.    On or about January 4, 2017, DEFENDANT KEATHLEY submitted her IA report concerning the police-involved shooting of LLOYD by DEFENDANT THOMAS. In her report,

DEFENDANT KEATHLEY repeatedly states that LLOYD was shot by DEFENDANT THOMAS in the dwelling of 3220 King Road instead of 3114 King Road.

92.    In her January 4, 2017 report, DEFENDANT KEATHLEY stated that the SWAT DEFENDANTS "executed a narcotics search and seizure warrant at 3220 King Road."  In her January 4, 2017 report, she stated that the SWAT DEFENDANTS entered "[t]wo separate structures, a residence and a shop building."

93.    Nowhere in her January 4, 2017 report does DEFENDANT KEATHLEY state that the address of the "shop" is 3114 King Road.  Nowhere in her January 4, 2017 report does DEFENDANT KEATHLEY indicate that when she sent her November 4, 2016 letter to LLOYD, she sent it to 3114 King Road.  Nowhere in her January 4, 2017 report does she mention the address "3114 King Road."

94.    During the IAD investigation, neither DEFENDANT BUCKNER nor INVESTIGATING DEFENDANTS raised the issue that the September 1, 2016 "no-knock" warrant execution on 3114 King Road may not have complied with the Fourth Amendment.

95.    During the IAD investigation, neither DEFENDANT BUCKNER nor INVESTIGATING DEFENDANTS raised the issue that the September 1, 2016 "no-knock" warrant execution on the dwelling located at 3220 King Road may not have complied with the Fourth Amendment.

LRPD DEADLY FORCE REVIEW BOARD

96.    DEFENDANT TEMPLE was the chairman of the DFRB that reviewed the IAD investigation of DEFENDANT THOMAS' shooting of LLOYD.

97.    On or about June 6, 2017, DEFENDANT TEMPLE submitted his DFRB report concerning the police-involved shooting of LLOYD by DEFENDANT THOMAS.  In his June 6,

23

2017 report, DEFENDANT TEMPLE repeatedly states that LLOYD was shot by DEFENDANT THOMAS in the dwelling of 3220 King Road instead of 3114 King Road.

98.     In his June 6, 2017 report, DEFENDANT TEMPLE stated that the SWAT DEFENDANTS "executed a no knock search and seizure warrant at two separate structures located in Pulaski County at 3220 King Road."

99.     Nowhere in his June 6, 2017 report does DEFENDANT TEMPLE state that the address of one of the "two separate structures" is 3114 King Road.  Nowhere in his report does he mention the address "3114 King Road."

100.    DEFENDANT TEMPLE's June 6, 2017 report does not state the number of shots fired by DEFENDANT THOMAS.

101.    During the DFRB review, no one raised the issue that the September 1, 2016 "no-knock" warrant execution on 3114 King Road may not have complied with the Fourth Amendment.

102.    During the DFRB review, no one raised the issue that the September 1, 2016 "no-knock" warrant execution on the dwelling located at 3220 King Road may not have complied with the Fourth Amendment.

103.    For DEFENDANT KEATHLEY or DEFENDANT TEMPLE officially to state that LLOYD's shooting occurred at 3114 King Road would be to draw attention to the fact that the NARCOTICS DEFENDANTS and SWAT DEFENDANTS were never legally authorized to enter 3114 King Road in the first place.

104.    On September 22, 2016, Little Rock City Attorney, Thomas M. Carpenter, drafted an email to DEFENDANT BUCKNER and other high-ranking LRPD officers.  In Mr. Carpenter's

24

email to DEFENDANT BUCKNER, he advised that police officers are required by the U.S. Constitution to give suspects a warning, if practicable, before using deadly force upon them .

105.    During the IAD investigation, no one raised the issue that DEFENDANT THOMAS' failure to give a warning may not have complied with the Fourth Amendment.

106.    During the DFRB review, no one raised the issue that DEFENDANT THOMAS' failure to give a warning may not have complied with the Fourth Amendment.

107.    The official reports submitted by DEFENDANT KEATHLEY and DEFENDANT TEMPLE were reviewed by LRPD Assistant Chief of Police, Alice Fulk, and DEFENDANT BUCKNER.

108.    DEFENDANT BUCKNER has testified that he reviewed all IAD deadly force files generated during his tenure as LRPD Chief of Police.  Therefore, DEFENDANT BUCKNER reviewed the IAD file associated with the police-involved shooting of LLOYD by DEFENDANT THOMAS (IAD Case No. II2016-00018), read the report from LRPD Incident No 2016-107426 and read DEFENDANT KEATHLEY's November 4, 2016 letter to LLOYD.

109.    Because NARCOTICS DEFENDANTS and SWAT DEFENDANTS never obtained a warrant to enter 3114 King Road, they had no legal right to enter 3114 King Road on September 1, 2016.

110.    DEFENDANT BUCKNER never raised any concerns that NARCOTICS DEFENDANTS and SWAT DEFENDANTS entered the residence at 3114 King Road without having a court-issued warrant to do so.

111.    After DEFENDANT KEATHLEY's IAD investigation, DEFENDANT BUCKNER authorized the exoneration of DEFENDANT THOMAS in the police-involved shooting of LLOYD.

25

112.    On September 14, 2017, the criminal matter of *State of Arkansas v. Christopher Davenport*, Pulaski Circuit Court Criminal Case No. LRCR-16-4810, was dismissed on September 15, 2017.

113.    Prior to the filing of the instant lawsuit, the criminal matter of *State of Arkansas v. Susan Davenport* was dismissed.

114.    Prior to the filing of the instant lawsuit, the criminal matter of *State of Arkansas v. Lloyd St. Clair*, Pulaski Circuit Court Criminal Case No. LRCR-16-5700, was dismissed.

115.    Prior to the filing of the instant lawsuit, the criminal matter of *State of Arkansas v. Floyd St. Clair*, Pulaski Circuit Court Criminal Case No. LRCR-16-4795, was dismissed.

116.    PLAINTIFFS herein assert against the CITY, DEFENDANT BUCKNER and DEFENDANT OFFICERS a right of relief arising out of the same transaction, occurrence and/or series of transactions or occurrences, namely, the two (2) "no-knock" raids occurring on September 1, 2016 and the promulgation of an unconstitutional official policy and/or an unconstitutional *Monell* "custom."

117.    That these transactions and occurrences are logically related and bear a close connection based upon their logical relationship to each other.

118.    That PLAINTIFFS' cases have questions of law and fact common to them all and to the CITY, DEFENDANT BUCKNER and DEFENDANT OFFICERS, including, but not limited to: a) when the alleged conduct occurred; b) whether the same individuals were involved; c) whether the conduct was intentional; d) whether the conduct was similar; e) whether DEFENDANT BUCKNER and DEFENDANT OFFICERS and others engaged in conspiratorial acts; and f) whether the conduct of the CITY and/or DEFENDANT BUCKNER implicates a system of decision-making or a widely-held policy.

26

119.    That PLAINTIFFS' cases have additional questions of law and fact common to all PLAINTIFFS and to DEFENDANT BUCKNER, individually, including whether DEFENDANT BUCKNER is personally liable for single act supervisory liability.

120.    That in the previously-filed lawsuit this Honorable Court ruled that LLOYD's cause of action is not barred by the *Heck* doctrine and that his excessive force claim is not negated by any prior criminal court representation stemming from the incident.  See June 23, 2020 Court Order (Doc. #30: Case No. 4:19-CV-00552-JM), attached hereto as Exhibit B.  That the standard for judgment on the pleadings under Rule 12(c) is same as the standard for Rule 12(b)(6) motions to dismiss. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

## COUNT I
## DEFENDANT AMBER KALMER AND DEFENDANT RUSS LITTLETON
## VIOLATION OF FOURTH AMENDMENT

121.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred twenty (120) as and for Paragraph one hundred twenty-one (121) of Count I.

122.    At all relevant time, police officers, such as DEFENDANT KALMER and DEFENDANT LITTLETON, had a duty to be truthful in affidavits seeking to obtain a search warrant to enter the dwelling of a Little Rock citizen and a duty not to omit from affidavits any material information.

123.    At all relevant times, police officers, such as DEFENDANT KALMER and DEFENDANT LITTLETON, had a duty to properly execute controlled drug purchases during sting operations so that they comply with the U.S. Constitution, particularly the Fourth Amendment, and also with LRPD policy and established police protocol.

124.    Despite these constitutional requirements and duties:

    a) DEFENDANT KALMER intentionally misrepresented the number of years employed as a police officer to obtain a "no-knock" warrant of 3220 King Road;

    b) DEFENDANT KALMER intentionally mispresented her professional experience conducting "no-knock" narcotics raids to obtain a "no-knock" warrant of 3220 King Road;

    c) DEFENDANT KALMER intentionally misrepresented the CI's experience to obtain a "no-knock" warrant of 3220 King Road;

    d) DEFENDANT KALMER intentionally misrepresented the CI's success rate to obtain a "no-knock" warrant of 3220 King Road;

    e) DEFENDANT KALMER and DEFENDANT LITTLETON intentionally misrepresented material aspects of the alleged drug purchase to obtain a "no-knock" warrant of 3220 King Road;

    f) DEFENDANT KALMER and DEFENDANT LITTLETON falsely claimed to have observed material aspects of the alleged drug purchase to obtain a "no-knock" warrant of 3220 King Road;

    g) DEFENDANT KALMER and DEFENDANT LITTLETON conspired with the C.I. and trafficked false information provided by the C.I. in order to obtain a "no-knock" warrant of 3220 King Road;

    h) DEFENDANT KALMER and DEFENDANT LITTLETON knew that 3114 King Road was a separate address from 3220 King Road but falsely represented that the "shop" was located at 3220 King in the affidavit to obtain a "no-knock" warrant of 3220 King Road;

    i) DEFENDANT KALMER and DEFENDANT LITTLETON knew the C.I. they used was unreliable but falsely represented that the C.I. was reliable in order to obtain a "no-knock" warrant of 3220 King Road;

    j) DEFENDANT KALMER and DEFENDANT LITTLETON intentionally mispresented the address at 3220 King Road multiple times;

k) DEFENDANT KALMER and DEFENDANT LITTLETON intentionally failed to search or properly search the C.I. they used; and

l) DEFENDANT KALMER and DEFENDANT LITTLETON intentionally failed to search or properly search the vehicle of the C.I. they used.

125.    By reason of the conduct of DEFENDANT KALMER and DEFENDANT LITTLETON, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

126.    The acts committed by DEFENDANT KALMER and DEFENDANT LITTLETON, and each of them, were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of their Fourth and Fourteenth Amendment Rights.    Therefore, DEFENDANT KALMER and DEFENDANT LITTLETON, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney's fees.

## COUNT II
### NARCOTICS DEFENDANTS AND SWAT DEFENDANTS
### VIOLATIONS OF THE FOURTH AMENDEMENT
### UNLAWFUL ENTRY

127.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred twenty-six (126) as and for Paragraph one hundred twenty-seven (127) of Count II.

128.    The Fourth Amendment prohibits unreasonable searches and seizures.    At all relevant times, police officers, including NARCOTICS DEFENDANTS and SWAT DEFENDANTS, have a duty to report violations of the U.S. Constitution that they observe or of which they are otherwise aware.

29

129.    At all relevant times, the LRPD had a Limits of Authority policy which required that "Little Rock Police Department personnel who are engaged in criminal investigations or law enforcement actions shall make sure that all persons are afforded the rights and protection guaranteed by the Constitution of the United States."

130.    NARCOTICS DEFENDANTS and SWAT DEFENDANTS, and each of them, engaged in unlawful, unconstitutional conduct by:

      a)  executing a search and seizure on the dwelling at 3220 King Road on September 1, 2016 without a basis in law for a search and seizure at 3220 King Road;

      b)  executing a search and seizure on the dwelling at 3114 King Road on September 1, 2016 without a court-issued warrant authorizing a search and seizure at 3114 King Road;

      c)  failing to prevent the search and seizure of the dwelling at 3220 King Road on September 1, 2016 because there was no basis in law for the search and seizure;

      d)  failing to prevent the search and seizure of the dwelling at 3114 King Road on September 1, 2016 because there was no court-issued warrant authorizing the search and seizure; and

      e)  executing "no-knock" raids on the dwelling at 3220 King Road and 3114 King Road despite the lack of a "high risk" situation and other criteria.

131.    The September 1, 2016 "no-knock" raids conducted upon 3220 King Road and 3114 by NARCOTICS DEFENDANTS and SWAT DEFENDANTS, and each of them, were unnecessary and unreasonable and caused PLAINTIFFS' injuries and damages.

132.    By reason of the conduct of NARCOTICS DEFENDANTS and SWAT DEFENDANTS, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

133. The acts committed by NARCOTICS DEFENDANTS and SWAT DEFENDANTS, and each of them, PLAINTIFFS were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of their Fourth and Fourteenth Amendment Rights. Therefore, NARCOTICS DEFENDANTS and SWAT DEFENDANTS, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney fees.

## COUNT III
### DEFENDANT MATTHEW THOMAS
### VIOLATION OF FOURTH AMENDMENT
### EXCESSIVE FORCE

134. PLAINTIFFS hereby incorporate and re-alleges Paragraphs one (1) through one hundred thirty-three (133) as and for Paragraph one hundred thirty-four (134) of Count III.

135. On September 1, 2016, DEFENDANT THOMAS used excessive force against LLOYD's person, causing great injury, anxiety, stress, mental anguish, pain and suffering.

136. The force used by DEFENDANT THOMAS was unnecessary and unreasonable, and LLOYD's permanent injuries, anxiety, stress, mental anguish, pain and suffering resulted directly from the use of said force which was excessive.

137. By reason of the conduct of DEFENDANT THOMAS, LLOYD was deprived of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

138. The violence committed by DEFENDANT THOMAS, and inflicted upon LLOYD was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of LLOYD's Fourth Amendment Rights. Therefore, DEFENDANT THOMAS is liable to LLOYD in damages pursuant to 42 U.S.C. § 1983, including loss of liberty interest, conscious pain and suffering, punitive damages and attorney fees.

31

<u>COUNT IV</u>
**CITY OF LITTLE ROCK**
**UNCONSTITUTIONAL OFFICIAL POLICY AND/OR**
**UNCONSTITUTIONAL *MONELL* CUSTOM**

139.  PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred thirty-eight (138) as and for Paragraph one hundred thirty-nine (139) of Count IV.

140.  At all relevant times, over the course of many years, there existed an unconstitutional official policy and/or unconstitutional *Monell* custom at the LRPD whereby:

a) DEFENDANT BUCKNER required that all LRPD search warrants be executed with the assistance of the SWAT Unit, including SWAT DEFENDANTS, showing a deliberate indifference to the inherently dangerous nature of SWAT raids;

b) LRPD police officers, including NARCOTICS DEFENDANT intentionally misrepresented the number of years employed as a police officer;

c) LRPD police officers, including NARCOTICS DEFENDANTS, intentionally mispresented their professional experience conducting "no-knock" narcotics raids to obtain  "no-knock" warrants;

d) LRPD police officers, including NARCOTICS DEFENDANTS, intentionally misrepresented C.I.s' experience to obtain "no-knock" warrants;

e) LRPD police officers, including NARCOTICS DEFENDANTS, intentionally misrepresented C.I.s' success rate to obtain "no-knock" warrants;

f) LRPD police officers, including NARCOTICS DEFENDANTS, intentionally misrepresented material aspects of alleged drug purchases to obtain no-knock warrants;

g) LRPD police officers, including NARCOTICS DEFENDANTS, falsely claimed to have observed material aspects of alleged drug purchases to obtain "no-knock" warrants;

h) LRPD police officers, including NARCOTICS DEFENDANTS, conspired with C.I.s and trafficked false information provided by C.I.s in order to obtain "no-knock" warrants;

i)  a code of silence concealing police misconduct was tolerated and maintained to perpetuate the LRPD's unconstitutional practice of obtaining and executing "no-knock" warrants without a legal or justifiable basis; and

j)  DEFENDANT BUCKNER and DEFENDANT OFFICERS concealed, intentionally mispresented and withheld material information during internal investigations in order to continue perpetrating the mandatory SWAT policy, to continue to obtain "no-knock" warrants and to protect LRPD police officers from criminal or civil liability.

141.    The allowance of this pattern was the result of deliberate indifference to fact that LRPD's official policies and/or customs were in violation of the Fourth Amendment and would naturally result in the violation of the constitutional rights of Little Rock citizens, including PLAINTIFF.

142.    On October 14, 2018, the *Washington Post* published an opinion article entitled "*Little Rock's dangerous and illegal drug war.*"  The author, Radley Balko, explained that the LRPD's "no-knock" warrantless raids rarely turn up the contraband sought and run afoul of the protections afforded by the Fourth Amendment on at least two different bases.  Mr. Balko discussed the research that went into his article and some of the conclusions he reached:

> I've talked to [ten] people who have been raided by the LRPD's narcotics unit over the past two years.  I've also reviewed more than 100 search warrants executed by the unit since 2016.  According to policing and Fourth Amendment experts, these interviews and warrants show that the LRPD narcotics cops and SWAT teams are routinely violating the Fourth Amendment rights of Little Rock residents.  They're also putting people at unnecessary risk.  And there's strong evidence that, in some cases, officers have made demonstrably false statements under oath.

> *****

> Nearly all the people raided that I spoke to were lower-income, and all but one were black.  Of the 105 warrants I reviewed, 84 were for black suspects, 16 were for white and five were for Latinos.  Little

Rock as a whole is 46 percent white and 42 percent black. Hispanics and Latinos of any race make up just under 7 percent of the population. (emphases added)

143.   On June 12, 2019, DEFENDANT BUCKNER's successor, Chief Keith Humphrey, announced an overhaul of the LRPD "no-knock" search warrant process, unveiling pertinent new policies, including a threat-assessment for no-knock warrants and more oversight of C.I.s.

144.   Chief Humphrey's policy changes involved revamping the process for using C.I.s—including closer scrutiny of these individuals—and instituting a purging process for C.I.s who are no longer viable for use in investigations. Per the changes, investigators seeking no-knock warrants must complete a threat assessment that ranks the suspect by known violent offenses, drug or weapon possession and the fortification of the subject residence. A LRPD police sergeant and lieutenant must approve each affidavit, and the chief of police personally reviews each no-knock warrant that was approved.

145.   The pattern was so evident that in May 2020 the Mayor of the City of Little Rock announced that his office intended to have a third-party, independent investigation of the LRPD conducted in order to identify troubling patterns and practices within. The mayor sought to provide accountability and transparency for more effective policing and reliable governing. The scope of the investigation included: Personnel Policies and Procedures; Handling of Private and Confidential Information; and Harassment and Misconduct. The concerns within the LRPD which the investigation sought to address included: Nepotism; De-escalation tactics training and cultural competency; The Internal Affairs process; and Abuse of authority.

146.   The official policy and/or *Monell* "custom" described above was the moving force behind the violations of PLAINTIFFS' constitutional rights and proximately caused PLAINTIFFS' constitutional injuries. The official policy and/or *Monell* "custom" described above

34

also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFFS by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

147.    As a result of the official policies and/or customs described above, PLAINTIFFS' Fourth Amendment rights were violated. Therefore, the CITY is liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest, punitive damages and attorney fees.

**COUNT V**
**DEFENDANT BUCKNER AND DEFENDANT OFFICERS**
**CIVIL CONSPIRACY PER 42 U.S.C. § 1983**

148.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred forty-seven (147) as and for Paragraph one hundred forty-eight (148) of Count V.

149.    To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.

150.    DEFENDANT BUCKNER and DEFENDANT OFFICERS conspired amongst themselves and others to deprive PLAINTIFFS of their constitutional rights. DEFENDANT BUCKNER and DEFENDANT OFFICERS engaged in multiple overt acts in furtherance of the conspiracy alleged herein and these overt acts caused injury to PLAINTIFFS, including but not limited to:

    a) conspired to execute a "no-knock" raid upon 3220 King Road despite the fact that the NARCOTICS DEFENDANTS and SWAT DEFENDANTS had no legal basis to do so;

    b) conspired to execute a "no-knock" raid upon 3114 King Road despite the fact that the NARCOTICS DEFENDANTS

and SWAT DEFENDANTS never obtained a court-issued warrant to do so;

c) conspired to conceal fact that the NARCOTICS DEFENDANTS and SWAT DEFENDANTS had no legal basis to search the dwelling located at 3220 King Road;

d) conspired to conceal fact that the NARCOTICS DEFENDANTS and SWAT DEFENDANTS never obtained a court-issued warrant to search the dwelling located at 3114 King Road; and

e) misrepresented that the dwelling located at 3114 King Road was actually 3220 King Road in order to conceal the fact that they had no legal basis to enter either dwelling.

151.   By reason of the conduct of DEFENDANT BUCKNER and DEFENDANT OFFICERS, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

152.   The acts committed by DEFENDANT BUCKNER and DEFENDANT OFFICERS, and each of them, PLAINTIFFS were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of their Fourth and Fourteenth Amendment Rights. Therefore, DEFENDANT BUCKNER and DEFENDANT OFFICERS, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney fees.

WHEREFORE, PLAINTIFFS pray for judgment against DEFENDANT BUCKNER and DEFENDANT OFFICERS, in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

## COUNT VI
### NARCOTICS DEFENDANTS
### MALICIOUS PROSECUTION–STATE LAW

153.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred fifty-two (152) as and for Paragraph one hundred fifty-three (153) of Count VI.

154.    PLAINTIFFS were arrested without probable cause and in violation of Article 2, Section 15 of the Arkansas Constitution and in violation of the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101, *et seq.*    The acts, omissions and conduct of NARCOTICS DEFENDANTS complained of herein were willful, purposeful and malicious.

155.    NARCOTICS DEFENDANTS had PLAINTIFFS prosecuted for various crimes when they did not have probable cause to believe that PLAINTIFFS were guilty of these crimes.

156.    NARCOTICS DEFENDANTS acted with malice in working and conspiring with a C.I. who was well-known to be unreliable, to provide false information and to have prior convictions for filing false police reports.

157.    The malice of NARCOTICS DEFENDANTS is reflected in their fabricating false accounts, providing false information, submitting fraudulent affidavits, omitting exculpatory information and making other false representations, among other malicious acts.

158.    The malice of NARCOTICS DEFENDANTS is reflected in their knowing presentation of materially false and incriminating information to judges and magistrates.

159.    The malice of NARCOTICS DEFENDANTS is reflected in the continuation of criminal cases against  PLAINTIFFS despite knowing at all relevant times that there was no good faith probable cause determination.

160.    The malicious conduct of NARCOTICS DEFENDANTS resulted in damages to PLAINTIFFS.

37

161.    All criminal proceedings arising out of the charges brought by NARCOTICS DEFENDANTS against PLAINTIFFS terminated in PLAINTIFFS' favor.

WHEREFORE, PLAINTIFFS pray for judgment against NARCOTICS DEFENDANTS in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

**COUNT VII**
**NARCOTICS DEFENDANTS**
**FALSE ARREST**

162.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred sixty-one (161) as and for Paragraph one hundred sixty-two (162) of Count VII.

163.    NARCOTICS DEFENDANTS committed unlawful violations of certain PLAINTIFFS' personal liberty which consisted of detention without sufficient legal authority and which was not support by even arguable probable cause because the conduct of NARCOTICS DEFENDANTS was intentional.

WHEREFORE, PLAINTIFFS pray for judgment against NARCOTICS DEFENDANTS in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

**COUNT VIII**
**NARCOTICS DEFENDANTS AND SWAT DEFENDANTS**
**BATTERY–STATE LAW**

164.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred sixty-three (163) as and for Paragraph one hundred sixty-four (164) of Count VIII.

165.    NARCOTICS DEFENDANTS and SWAT DEFENDANTS acted with the intent to cause harmful or offensive contact with PLAINTIFFS and harmful or offensive contact did in fact occur insofar as PLAINTIFFS were handcuffed, pushed, shoved, shot, wrestled, pinned,

injured by projectiles and/or otherwise physically battered, with some PLAINTIFFS, such as LLOYD, suffering permanent physical injuries.

WHEREFORE, PLAINTIFFS prays for judgment against NARCOTICS DEFENDANTS and SWAT DEFENDANTS in an amount which will fully and fairly compensate PLAINTIFFS for damages suffered and asserted herein.

## COUNT IX
### NARCOTICS DEFENDANTS AND SWAT DEFENDANTS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS–STATE LAW

166.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred sixty-five (165) as and for Paragraph one hundred sixty-six (166) of Count IX.

167.    NARCOTICS DEFENDANTS and SWAT DEFENDANTS engaged in intentional and reckless conduct, which was equally extreme and outrageous.

168.    That there is a causal connection between the wrongful and fraudulent conduct committed by NARCOTICS DEFENDANTS and SWAT DEFENDANTS and the emotional distress suffered by PLAINTIFFS.  PLAINTIFFS' emotional distress consists of terrifying flashbacks, extreme anxiety, claustrophobia, nightmares, fear of police officers and/or other manifestations and is severe.

WHEREFORE, PLAINTIFFS pray for judgment against NARCOTICS DEFENDANTS and SWAT DEFENDANTS in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

## COUNT X
### DEFENDANT KENTON BUCKNER
### SINGLE ACT SUPERVISORY LIABILITY

169.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through one hundred sixty-eight (168) as and for Paragraph one hundred sixty-nine (169) of Count X.

170.    At all relevant times, DEFENDANT BUCKNER knew that "no-knock" warrants were reserved for "high-risk situations," and that it is unconstitutional and unlawful to knowingly submit affidavits which contain material misrepresentations of fact or are otherwise untruthful to judges or magistrates in order to obtain "no-knock" warrants. At all relevant times, DEFENDANT BUCKNER knew the inherently dangerous nature of SWAT entries.

171.    Nonetheless, DEFENDANT BUCKNER, the CITY's final policy-maker, consciously disregarded this known risk by:

    a)  promulgating official policy and/or custom in conflict with United States Constitution;

    b)  Failing to abolish official policy and/or custom in conflict with United States Constitution;

    c)  Permitting informal custom for SWAT in conflict with United States Constitution and LRPD policies; and

    d)  Allowing officers with a demonstrable history of materially misrepresenting facts in sworn affidavits to obtain "no-knock" warrants to continue to execute sworn affidavits with materially misrepresented facts to obtain search warrants.

172.    That there is a direct link between the official policy and/or custom promulgated or continued by DEFENDANT BUCKNER and the constitutional injuries sustained by PLAINTIFFS.

173.    The acts and omissions of the DEFENDANT BUCKNER described above were the moving force behind the violations of PLAINTIFFS' constitutional rights and proximately caused PLAINTIFFS' constitutional injuries. The official policy and/or custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFFS by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

174.    As a result of the official policies and/or customs described above, PLAINTIFFS'

Fourth Amendment rights were violated.  Therefore, the DEFENDANT BUCKNER is liable to

PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest, punitive

damages and attorney's fees.

WHEREFORE, Plaintiffs, by and through their attorneys, LAUX LAW GROUP and BEN

CRUMP, PLLC, and request judgment against the Defendants, and each of them:

1.  That Defendants be required to pay PLAINTIFFS' compensatory damages;

2.  That Defendants be required to pay actual damages;

3.  That DEFENDANT BUCKNER and DEFENDANT OFFICERS be required to pay punitive damages;

4.  That Defendants be required to pay attorney fees per 42 U.S.C. § 1988;

5.  That this Honorable Court provide appropriate injunctive relief;

6.  That this Honorable Court declare that the LRPD's official policies and/or customs described herein are unconstitutional; and

7.  That PLAINTIFFS have any other such relief as this Honorable Court deems just and proper.

Respectfully submitted,

Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFFS
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
        mikelaux@icloud.com

and

Benjamin L. Crump
E. Dist. Arkansas Bar No. 0072583
One of the Attorneys for PLAINTIFFS
BEN CRUMP, PLLC
122 S. Calhoun Street
Tallahassee, FL 32201
Telephone: (850) 224-2020
Email: ben@bencrump.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SUSAN DAVENPORT, et al.                          **PLAINTIFFS**

VS.                              NO. 4:19CV00552 JM

CITY OF LITTLE ROCK, et al.                      **DEFENDANTS**

## ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS

Plaintiffs have filed a motion to voluntarily dismiss their case without prejudice. The Court finds that Plaintiffs' motion to dismiss (Docket #71) should be, and hereby is, granted. The Clerk is directed to close the case.

The Court notes that Plaintiffs' right to re-file the case against the Defendants is subject to the provisions of Rule 41(d) of the Federal Rules of Civil Procedure. Under Rule 41(d), the Plaintiffs may be ordered to pay any costs of this action which the Court deems appropriate if Plaintiffs re-file the action against the Defendants.

The Court will address any outstanding discovery disputes when and if Plaintiffs refile their suit.

IT IS SO ORDERED this 6th day of October, 2020.

_____
James M. Moody, Jr.
United States District Judge

**Exhibit A**

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**SUSAN DAVENPORT, et al.**                              **PLAINTIFFS**

**VS.**                      **NO. 4:19CV00552 JM**

**CITY OF LITTLE ROCK, et al.**                      **DEFENDANTS**

### ORDER

Pending is Separate Defendant Matthew Thomas's motion for judgment on the pleadings on Count III of Plaintiffs' Complaint. (Docket # 22). Plaintiffs have filed a response. The motion is DENIED.

In Count III of Plaintiffs' Complaint, Plaintiff Lloyd St. Clair alleges that Separate Defendant Matthew Thomas used excessive force against him when Officer Thomas shot him on September 1, 2016 during the execution of a search warrant. On May 11, 2017 in the Circuit Court of Pulaski County, Arkansas, Fourth Division, Case No. CR-2016-3758, Plaintiff Lloyd St. Clair entered a plea of guilty to the charge of aggravated assault admitting that on September 1, 2016 he pointed a firearm at Officer Matt Thomas.

Officer Thomas argues that Count III of the Complaint should be dismissed against him for two reasons. First, Plaintiff's guilty plea to aggravated assault prevents him from asserting a Fourth Amendment excessive force claim pursuant to the decision in *Heck v. Humphrey,* 512 U.S. 477 (1994). Second, Plaintiff's admission in open court that he pointed a gun at Officer Thomas prior to being shot establishes that Separate Defendant's use of deadly force was objectively reasonable thereby entitling him to qualified immunity.

<u>Standard for the Motion for Judgment on the Pleadings Rule 12(c)</u>

**Exhibit B**

"Judgment on the pleadings should be granted only if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law." *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999). Although the Court must ignore most materials outside the pleadings, it may consider "materials that are 'necessarily embraced by the pleadings.' " *Id.* (quoting *Piper Jaffray Cos. v. National Union Fire Ins. Co.,* 967 F.Supp. 1148, 1152 (D.Minn.1997)). *See also* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"). In evaluating the motion, the Court accepts all facts pled by the nonmoving party as true and draws all reasonable inferences from the facts in favor of the nonmovant. *Franklin High Yield Tax-Free Income Fund v. County of Martin*, 152 F.3d 736, 738 (8th Cir.1998) (citing *Lion Oil Co. v. Tosco Corp.*, 90 F.3d 268, 270 (8th Cir.1996)).

## Discussion

In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court said:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487. A finding that Thomas used excessive force when he shot Lloyd during the execution of the search warrant would not necessarily imply the invalidity of Lloyd's conviction for aggravated assault. S*ee Colbert v. Monticello*, 775 F.3d 1006, 1008 (8th Cir. 2014) (holding

2

that there is no inherent conflict between finding that police officers used excessive force in effectuating an arrest, and a conviction for resisting arrest and harassment of police officer; state court's determination that individual resisted lawful arrest may coexist with finding that officers used excessive force to subdue him). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 681 (8th Cir. 2019)(citations omitted). The use of deadly force is not justified where the suspect poses no immediate threat to the officer and no threat to others. *Nance v. Sammis*, 586 F.3d 604, 611(8th Cir. 2009). "The requirement that the threat be reasonably perceived as 'immediate' means that if the threat has passed, so too has the justification for the use of deadly force. *Cole Estate of Richards v. Hutchins,* 959 F.3d 1127, 1132 (8th Cir. 2020) citing, *Rahn v. Hawkins*, 73 F. App'x 898, 901 (8th Cir. 2003) (per curiam). Because a finding of excessive force can coexist with Lloyd's conviction of aggravated assault, Lloyd's excessive force claim is not barred by Heck.

Further, the fact that Lloyd was convicted of aggravated assault for actions he took during the event does not preclude the possibility that the officer's use of force was excessive at the time of the shooting. *See, Cole Estate of Richards v. Hutchins,* 959 F.3d 1127 (8th Cir. 2020)(affirming the denial of qualified immunity where the suspect was pointing the gun either toward the ground or the sky, had retreated and turned away from the door).

Accordingly, the motion for judgment on the pleadings is denied. Plaintiffs are directed to file an amended complaint to correct the inaccurate factual allegations contained in the original complaint.

3

IT IS SO ORDERED this 23rd day of June, 2020.

_____

James M. Moody Jr.
United States District Judge